People v Hodgins (2022 NY Slip Op 01208)





People v Hodgins


2022 NY Slip Op 01208


Decided on February 24, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:February 24, 2022

111321 112401
[*1]The People of the State of New York, Respondent,
v
Kevin Hodgins, Appellant.

Calendar Date:January 4, 2022

Before:Egan Jr., J.P., Lynch, Pritzker and Reynolds Fitzgerald, JJ.

Veronica Reed, Schenectady, for appellant.
Susan J. Mallery, District Attorney, Howes Cave (Kevin P. Mallery of counsel), for respondent.



Egan Jr., J.P.
Appeals (1) from a judgment of the County Court of Schoharie County (Bartlett III, J.), rendered February 6, 2019, upon a verdict convicting defendant of the crime of manslaughter in the second degree, and (2) by permission, from an order of said court, entered May 20, 2019, which denied defendant's motion pursuant to CPL 440.10 and 440.30 to vacate the judgment of conviction.
On April 6, 2018, a verbal confrontation between two neighbors in the apartment building where defendant's four-year-old child lived occurred within earshot of the child. Defendant came over after his work shift ended and, around 10:30 p.m., knocked on the door of one of those neighbors, Christopher Croote, to discuss the incident. Soon after Croote answered the door, defendant stabbed Croote's house guest (hereinafter the victim) in the neck near his collar bone with a karambit style knife. The victim, who was bleeding heavily from a severed vein and artery, collapsed in the hallway between the two apartments and soon died. Several individuals called 911 to report the incident, including defendant, who had retreated into the apartment of his child's mother to avoid an enraged Croote. Defendant was taken into custody, and the knife was recovered.
Defendant was charged in an indictment with murder in the second degree and manslaughter in the second degree. Following a jury trial at which defendant testified that he stabbed the victim in self-defense after the victim and Croote, who he believed had a knife, attacked him, he was acquitted of murder in the second degree but convicted of manslaughter in the second degree. County Court thereafter sentenced defendant to 4 to 15 years in prison. Defendant appeals from the judgment of conviction and, by permission, from the order denying his subsequent CPL article 440 motion.
We affirm. Defendant's challenge to the legal sufficiency of the evidence supporting the verdict is unpreserved given that he made a generalized motion to dismiss at the close of the People's case that he failed to renew at the close of his own case (see People v Rahaman, 189 AD3d 1709, 1710 [2020], lv denied 36 NY3d 1059 [2021]; People v Splunge, 159 AD3d 1136, 1136 [2018]). Nevertheless, because defendant also argues that the verdict was against the weight of the evidence, we will still ensure that the People established each element of the crime (see People v Sorrell, 196 AD3d 923, 923 [2021], lv denied 37 NY3d 1029 [2021]; People v Cooper, 196 AD3d 855, 858 [2021], lv denied ___ NY3d ___ [Jan. 27, 2022]).
Manslaughter in the second degree is established, in relevant part, with proof beyond a reasonable doubt that a defendant "recklessly causes the death of another person" (Penal Law § 125.15 [1]), meaning that he or she "is aware of and consciously disregards a substantial and unjustifiable risk that" death will result from his or her conduct (Penal Law § 15.05 [3]; see People v Peters, 126 AD3d 1029, 1030 [2015], lv denied 25 NY3d 991 [2015[*2]]). Further, where a defendant advances a justification defense, the People are obliged to "demonstrate beyond a reasonable doubt that [he or she] did not believe deadly force was necessary or that a reasonable person in the same situation would not have perceived that deadly force was necessary" (People v Umali, 10 NY3d 417, 425 [2008], cert denied 556 US 1110 [2009]; see Penal Law § 35.15 [1], [2]; People v Every, 146 AD3d 1157, 1161 [2017], affd 29 NY3d 1103 [2017]). As a different verdict would not have been unreasonable here, we "must weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions," then "decide[] whether the jury was justified in finding the defendant guilty beyond a reasonable doubt" (People v Danielson, 9 NY3d 342, 348 [2007]; see People v Sorrell, 196 AD3d at 923-924; People v Taylor, 163 AD3d 1275, 1276 [2018], lv denied 32 NY3d 1068 [2018]). Although we review the evidence in a neutral light in making that assessment, " we also accord '[g]reat deference' to the jury's credibility determinations, given that the jurors have the 'opportunity to view the witnesses, hear the testimony and observe demeanor'" (People v Wilder, 200 AD3d 1303, 1304 [2021], quoting People v Bleakley, 69 NY2d 490, 495 [1987]; see People v Romero, 7 NY3d 633, 644 [2006]).
Turning to that evidentiary review, several key facts were undisputed. First, conditions were tense in the apartment building at the time of the stabbing, with frequent squabbling between residents, but there had been no problems between defendant, Croote or the victim beyond a minor incident in which defendant asked them to clean up their cigarette butts outside the building and they did so. Second, when defendant knocked on Croote's door, Croote answered it wearing a climbing gaff — a spur attached to his calf and foot with leather straps that he intended to use while climbing utility poles in the course of his work — that he had been showing to the victim. Finally, defendant brought the knife when he went to confront Croote and used it to stab the victim. The factual disputes revolved around what transpired during the confrontation and whether defendant acted in self-defense when he stabbed the victim.
In that regard, Croote and his girlfriend testified to what transpired after defendant knocked on the door. Croote, who denied that he had any knives within reach, stated that he opened the door to find defendant standing in an aggressive posture, his left hand clenched in front of him and his right hand behind his back at waist level. Defendant proceeded to confront him about the earlier incident, causing Croote to admit that he had sworn and yelled in front of defendant's child, ask for a chance to tell the whole story, and then remove the gaff from his leg.[FN1] The victim stepped between the two men to block defendant from advancing toward Croote as he leaned over a few feet away, after which [*3]Croote heard a "shallow thud" as though someone had been punched in the chest. Croote's girlfriend, who had been getting ready for bed but came to investigate after hearing Croote yelling something, testified that she saw the victim put his hand toward defendant and turn to look at her, at which point defendant stabbed him in the neck "for no reason." Thereafter, Croote looked up to see defendant holding the blood-drenched knife in his hand, seemingly preparing to strike again, and the victim holding his left hand to the stab wound and punching defendant with his right hand. Defendant was quickly driven out of the apartment, with Croote demanding to know why he had brought a knife with him, and the victim collapsed in the hallway.
The People also presented testimony from other residents in the apartment building as to what they saw and heard during the confrontation. Croote's next-door neighbor testified that she heard someone pounding on Croote's door and Croote crudely demanding to know why the visitor had brought a knife, prompting her to peek out of her door to see defendant standing there with a knife in his right hand. She then heard defendant reference the earlier incident with his child and watched him lunge into the apartment with the knife, after which the mortally wounded victim emerged from the apartment and punched defendant several times before collapsing in the hallway. The mother of defendant's child testified that she also heard much of the incident from inside her apartment, which included a voice she could not identify asking if defendant "want[ed] to go" and take it outside, then loud slams, a voice saying "something about a knife" and defendant protesting that he was defending himself.
The foregoing proof reflects, notwithstanding some discrepancies in the order of events, that defendant was already holding the knife when he confronted an unarmed Croote and that he stabbed the victim after what several witnesses described as an invitation to go outside to settle matters. Defendant testified to a somewhat different version of events, stating that the knife was in his pocket when he knocked on the door, that Croote behaved aggressively upon opening it and that Croote soon promised defendant that they were "going to go" and that he had "a knife, a big knife." Defendant added that the victim then got within a foot of him with fists clenched, also urging him to "take this outside," and that he only pulled his knife after Croote and the victim had punched him and Croote reached down and revealed what defendant thought was a sheathed knife strapped to his leg. The discrepancies in the testimony of the People's witnesses, as well as defendant's divergent account of events, raised credibility issues to be resolved by the jury. That said, "[a]ccording deference to the jury's assessments and upon our own review of the evidence — including that pertaining to defendant's intent and his justification defense — we find no reason [*4]to disturb the verdict" (People v Vanderhorst, 117 AD3d 1197, 1200 [2014], lv denied 24 NY3d 1089 [2014]; see People v Ramirez, 118 AD3d 1108, 1111 [2014]; People v Brooks, 32 AD3d 616, 617 [2006], lv denied 8 NY3d 844 [2007]; People v Wilt, 18 AD3d 971, 972 [2005], lv denied 5 NY3d 771 [2005]).
Defendant next argues that the People engaged in several instances of misconduct during the trial and at sentencing but, to the limited extent that the issue is preserved for our review, "County Court responded appropriately to defense counsel's objections regarding the prosecutor's conduct and we conclude that the prosecutor's overall conduct was not . . . a flagrant and pervasive pattern of prosecutorial misconduct . . . entitling defendant to a new trial" (People v Wright, 88 AD3d 1154, 1158 [2011] [internal quotation marks and citations omitted], lv denied 18 NY3d 863 [2011]). We also do not agree with defendant that his trial counsel was ineffective in failing to more vigorously challenge the examples of prosecutorial misconduct that defendant perceives or, for that matter, in any other respect. This was a difficult case in which defendant indisputably instigated an encounter that ended with him stabbing and killing the victim, and defense counsel handled it capably by advancing a cogent trial strategy that resulted in defendant being acquitted of the top count of the indictment, then successfully seeking to prevent County Court from considering potentially prejudicial information in sentencing him. Thus, "when viewed in totality, we are satisfied that defendant received meaningful representation" (People v Rodriguez, 195 AD3d 1237, 1242 [2021], lv denied 37 NY3d 1061 [2021]; see People v Mesko, 150 AD3d 1412, 1414-1415 [2017], lv denied 29 NY3d 1131 [2017]; People v Molano, 70 AD3d 1172, 1177 [2010], lv denied 15 NY3d 776 [2010]).
Defendant's arguments relating to sentencing are unavailing. Nothing in CPL 380.50 limits "a sentencing court's discretionary authority to allow others close to the victim to address the court at sentencing," and County Court providently exercised that discretion when, with the agreement of counsel, it considered written statements from the victim's father and stepmother while declining to consider those submitted by his friends (People v Hemmings, 2 NY3d 1, 6 [2004]; see People v Iovinella, 295 AD2d 753, 753 [2002], lv denied 99 NY2d 536 [2002]). In the absence of any proof that County Court considered the other letters, defendant's speculation on that score does not overcome the presumption of regularity afforded to judicial proceedings (see People v Turley, 267 AD2d 600, 601 [1999], lv denied 94 NY2d 926 [2000]; People v Kalakowski, 120 AD2d 763, 765 [1986], lv denied 68 NY2d 669 [1986]). Further, after considering the relevant factors, County Court cited defendant's "horribly reckless" conduct in pulling and using the knife in imposing a sentence of 4 to 15 years in prison, the lower bound of which was less than [*5]that authorized (see Penal Law § 70.00 [2] [c]; [3] [b]). That sentence fell "within the statutorily authorized range" and, although defendant argues that it was harsh and excessive given his clean criminal record and expressed remorse, our review does not reveal either "a clear abuse of discretion or the existence of extraordinary circumstances" that would warrant its modification in the interest of justice (People v Miller, 45 AD3d 1190, 1191 [2007]; see People v Smith, 32 AD3d 1082, 1082 [2006]).
Finally, defendant contended in his CPL article 440 motion that the prosecutor deprived him of a fair trial by improperly failing to disclose their prior acquaintance. Defendant alleged that their relationship amounted to the prosecutor chatting with defendant when she ran into him at her family's business, recusing from a case against him related to a 2017 traffic ticket, and informally telling him how to file a petition in Family Court. Those allegations reflect that defendant and the prosecutor never had an attorney-client relationship in which the former entrusted confidential information to the latter, and there was therefore neither an appearance of impropriety nor "actual prejudice arising from a demonstrated conflict of interest or a substantial risk of an abuse of confidence" that would have warranted the prosecutor's disqualification (Matter of Schumer v Holtzman, 60 NY2d 46, 55 [1983]; see People v Adams, 20 NY3d 608, 612 [2013]; People v Jenkins, 186 AD3d 31, 36 [2020], lv denied 35 NY3d 1095 [2020]; People v Zinkhen, 89 AD3d 1319, 1320 [2011], lv denied 18 NY3d 964 [2012]). Thus, even assuming that the issue could not "with due diligence by the defendant have readily been made to appear on the record in a manner providing adequate basis for review" upon his direct appeal (CPL 440.10 [3] [a]), defendant's CPL article 440 motion was properly denied without a hearing because he failed to allege essential facts to support his claim (see CPL 440.30 [4] [b]).
Lynch, Pritzker and Reynolds Fitzgerald, JJ., concur.
ORDERED that the judgment and order are affirmed.



Footnotes

Footnote 1: Croote may not have been genteel in making that admission, as his girlfriend recounted to investigators how he told defendant that "[n]obody meant any disrespect in front of your f***ing son."